IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KATRINA LORANE SCOTT,            )
                                 )
              Plaintiff,         )
                                 )
v.                               )    Case No. CIV-19-324-RAW-KEW
                                 )
COMMISSIONER OF THE SOCIAL       )
SECURITY ADMINISTRATION,         )
                                 )
              Defendant.         )

### REPORT AND RECOMMENDATION

Plaintiff Katrina Lorane Scott (the "Claimant") requests judicial review of the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying Claimant's application for disability benefits under the Social Security Act. Claimant appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Claimant was not disabled. For the reasons discussed below, it is the recommendation of the undersigned that the Commissioner's decision be AFFIRMED.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . ." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . ." 42 U.S.C. §423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. *See*, 20 C.F.R. §§ 404.1520, 416.920.[1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. Hawkins v. Chater, 113 F.3d 1162, 1164 (10th Cir. 1997)(citation omitted). The term "substantial evidence" has been interpreted by the United States Supreme Court to require "more than a mere scintilla. It

---

[1] Step one requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. 20 C.F.R. §§ 404.1521, 416.921. If the claimant is engaged in substantial gainful activity (step one) or if the claimant's impairment is not medically severe (step two), disability benefits are denied. At step three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to step four, where claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's step four burden is met, the burden shifts to the Commissioner to establish at step five that work exists in significant numbers in the national economy which the claimant – taking into account his age, education, work experience, and RFC – can perform. Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. *See generally,* Williams v. Bowen, 844 F.2d 748, 750-51 (10th Cir. 1988).#

means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The court may not re-weigh the evidence nor substitute its discretion for that of the agency. Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991). Nevertheless, the court must review the record as a whole, and the "substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); *see also*, Casias, 933 F.2d at 800-01.

### Claimant's Background

Claimant was 49 years old at the time of the ALJ's latest decision. Claimant obtained a GED and attended two years of college, obtaining an associate's degree in criminal justice. Claimant has worked in the past as a clerical worker/bookkeeper. Claimant alleges an inability to work beginning April 1, 2007 due to limitations resulting from back problems, numbness in the legs, and bladder problems.

### Procedural History

This case has a long and tortured history. On October 15, 2009, Claimant protectively filed for supplemental security income pursuant to Title XVI (42 U.S.C. § 1381, *et seq.*) of the Social Security Act. Claimant's application was denied initially and upon reconsideration. After an administrative hearing, the Administrative Law Judge ("ALJ")

3

issued an unfavorable decision on March 3, 2011. The Appeals Council denied review but this Court reversed and remanded the decision on appeal.

On September 16, 2013, the ALJ conducted a second administrative hearing. On January 14, 2014, the ALJ issued an unfavorable decision. The Appeals Council declined to review the decision on April 14, 2014. By Order and Judgment entered November 17, 2015, this Court again reversed the ALJ's decision and remanded the case for further proceedings.

After a supplemental hearing on remand, the ALJ entered a third unfavorable decision on September 1, 2016. On appeal, this Court once again reversed the ALJ's decision and remanded the case for the ALJ to determine the functional limitations imposed upon Claimant by her neurogenic bladder and required catheterization Claimant.

On September 28, 2016, Claimant protectively filed an additional application for supplemental security income pursuant to Title XVI (42 U.S.C. § 1381, *et seq.*) of the Social Security Act. On October 19, 2017, the ALJ issued an unfavorable decision on the application for benefits. On review, the Appeals Council determined that this decision suffered from the same deficiency as the prior decision reversed and remanded by this Court and reversed the later decision as well. The Appeals Council remanded the decision and directed the ALJ to consolidate the claims, offer an opportunity for Claimant to have another hearing

and issue a new decision on the consolidated claims, considering the basis for this Court's reversal and remand.

On January 3, 2019, ALJ Michael Mannes conducted a further administrative hearing. He issued an unfavorable decision on April 10, 2019. On August 14, 2019, the Appeals Council denied review of the decision. As a result, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation. He determined that while Claimant suffered from severe impairments, she retained the residual functional capacity ("RFC") to perform light work.

## Error Alleged for Review

Claimant asserts the ALJ committed error in (1) failing to apply the *de minimus* standard at step two of the sequential analysis in finding Claimant's neurogenic bladder was not a severe impairment and, consequently, failing to include any related limitations in the RFC; and (2) failing to evaluate the treating opinion evidence consistent with the Social Security regulations, Agency policy, and legal precedent. Claimant also requests that, due to the extended pendency of her claims for benefits, the matter be remanded with instructions for the awarding of benefits.

### Step Two Evaluation

In his decision, the ALJ determined Claimant suffered from the severe impairments of degenerative disc disease of the cervical and lumbar spine, bilateral knee osteoarthritis, COPD, persistent depressive disorder, major depressive disorder by history, recurrent, and anxiety disorder. (Tr. 1371). The ALJ concluded that Claimant retained the RFC to perform light work. In so doing, he determined Claimant should only occasionally climb ramps and stairs; no climbing of ladders, ropes, or scaffolds; frequent balancing; and occasional stooping, kneeling, crouching, and crawling. Claimant must avoid even moderate exposure to dust, odors, fumes, and pulmonary irritants. The ALJ found Claimant could perform simple and some complex tasks with routine supervision, could tolerate frequent interaction with supervisors and co-workers, and incidental interaction with the general public in performance of work-relate tasks. She could respond appropriately to changes in a routine work setting which are gradual and infrequent. He also found Claimant's time off-task could be accommodated with normal work breaks. (Tr. 1381).

After consulting with a vocational expert, the ALJ concluded Claimant could not perform her past relevant work but could perform the representative jobs of office helper, mail sorter, and small products assembler, all which were found to exist in sufficient numbers in the national economy. (Tr. 1391). As a result, the ALJ found Claimant was not disabled since October 15, 2009, the date the application for

benefits was filed.  Id.2

Claimant contends that the ALJ failed once again to properly evaluate her neurogenic bladder condition.  While all decisions by the various ALJs considering Claimant's claims have previously found her bladder condition to be severe at step two, the latest decision has concluded that the condition is "non-severe" and, therefore, declined to impose further restrictions upon her RFC based upon it.

The primary basis for the ALJ's conclusion of non-severity lies in his opinion that the condition has not been consistently diagnosed in the medical record. (Tr. 1371-75). He also stated that where the condition of neurogenic bladder is contained in the record, it is only based upon Claimant's reporting of the condition. (Tr. 1371).

An extensive review of the available medical records on Claimant's condition of neurogenic bladder is required.  In reports from Dr. Geo Chacko dating in February of 2009 (Tr. 205), April of 2009 (Tr. 204), Claimant sought treatment for back pain attributable by Dr. Chacko to "spinal stenosis" and "sciatica".  However, specific reference is made in these reports that "pt denies any change in bowel habits, no bleeding in stool, no urinary frequency . . . ."3  In October of 2009, Claimant

---

2 The ALJ also stated that Claimant's representative amended the onset date to October 15, 2009, the protective filing date.
3 Claimant also sought treatment from Dr. Chacko in October of 2008 (Tr. 208) and December of 2008 (Tr. 206) for back and leg pain.  These reports make no mention of urinary complaints.

sought treatment at the OU Medical Center in Oklahoma City, Oklahoma. She complained of back pain. She also had "some chronic bowel and bladder problems with some possible recent increase in urinary incontinence." (Tr. 190). Claimant was noted to have post void residual of 185 ml utilizing an in/out catheterization sterile technique. Her residual was found to be "somewhat increased." (Tr. 191, 194). An MRI was performed on Claimant's lower back. Included in the notation for the reason for the exam was to rule out cauda equina syndrome. (Tr. 195). The MRI of the lumbar spine was "unremarkable" and no further conclusion is drawn in the report in evaluating for cauda equina syndrome. Id.

In a record from Dr. Geo Chacko on October 15, 2009, the "subjective" notation includes that Claimant "[s]ubsequently was diagnosed with cauda equina syndrome and is having severe pain." He also stated in his "assessment" that Claimant had "[c]auda equina syndrome." (Tr. 200).

In August of 2009, Claimant sought treatment from McAlester Pain Services complaining of lower back, hip, buttocks, and leg pain. (Tr. 210). Under the notations for "genitourinary", the report indicated Claimant "[d]enies hematuria, incontinence, pain or colic, pelvic pain, history of renal stones or gravel, and UTI symptoms." (Tr. 211). The report also indicated Claimant "[b]roke neck at age 13. surgery at age 14, then wore back and neck brace for one year." (Tr. 213). This event

8

allegedly gave rise to the diagnosis of cauda equina syndrome according to Claimant.  No mention of that condition, however, is referenced in this report.

In a report from November of 2009, Dr. Galis found that an evaluation of Claimant's back condition produced "findings [which] are all against a cauda equina syndrome diagnosis, except the subjective saddle hypesthesia which may indicate lower sacral roots pathology (may consider a partial cauda equina syndrome, but not as the cause of her other symptoms)."  (Tr. 245).

In January of 2010, Claimant was referred by Dr. Smaranda Galis to "[e]valuate for a neurogenic bladder.  Patient gives history of urinary retention, there are reasons to doubt the organicity."  (Tr. 237).  In a note from the same day, an home health nurse reported that when she arrived at Claimant's home, Claimant had already removed her Foley bag and said she took it out when she gets tired of it and then when she feels like using it again, boils it and reinserts it.  Claimant would not permit the nurse to change the Foley bag but eventually let her. The nurse also reported that Claimant walked without assistance.  The conclusion was reached that home health care would have to end because Claimant was able to self-catheterize and did not need their assistance. Id.

Dr. Galis noted that Claimant had worn a Foley bag for four months because of urinary retention problems "which started about two years

ago; she can urinate some but has to push really hard she says and when she does that her back starts hurting." The Foley bag was off the day of Dr. Galis' examination because it was clogged. Claimant also reported that she had a urology evaluation six months prior for hematuria but no cause was found. (Tr. 238). Dr. Galis concluded after his examination, "I am puzzled by her bladder and bowel problems suggesting neurogenic bowel and bladder, will request postvoid residuals as a first step, and try to find from Dr. Chacko more details, may send her again to urology." (Tr. 240).

In March of 2010, Claimant was referred to Dr. Gennady Slobodov at the Urology Clinic by Dr. Galis. Under the history section, Claimant's bladder problems were noted as existing for "several years" lasting "all the time" and involving hesitancy and straining with difficulty to void. (Tr. 248). The diagnosis included neurogenic bladder with hesitancy, straining, and hematuria. A CT scan was ordered with a finding of a "likely hypoactive bladder" and possible detrusor sphincter dyssynergia ("DSD")(Tr. 249).

Also contained in the record is a questionnaire completed by Claimant concerning her bladder conditions. (Tr.252). She answered the question concerning "frequent urination during the daytime hours" as "somewhat", "night-time urination" as "somewhat, and "waking up at night because you had to urinate" as "a little bit". The remaining questions consisting of "an uncomfortable urge to urinate", "a sudden

urge to urinate with little or no warning", "accidental loss of small amounts of urine", "an uncontrollable urge to urinate", and "urine loss associated with a strong desire to urinate" were all answered "not at all." Claimant scored a "5" on this questionnaire which provided that if the score was "8 or greater", the person "may have an overactive bladder." Id.

In April of 2010, a CT scan of Claimant's pelvis revealed kidneys which were unremarkable without evidence of stone, mass, lesion, or hydronephrosis. Her ureters were unremarkable bilaterally. Claimant's bladder was within normal limits. (Tr. 254).

Also, in April of 2010, a urodynamic procedure was performed on Claimant. The volume she voided was 13 cc with peak flow at 3 cc/second and residual urine of 20 cc. The filling phase indicated a 310 cc capacity with involuntary detrusor contractions. Claimant had the first conscious sensation at 70 cc and a strong urge at 208 cc with no leakage. During the voiding phase, the maximum detrusor pressure was 50 cm with abnormal sphincter contractions. Residual urine was 310 cc. Final impressions from the testing was DSD and neurogenic detrusor overactivity. (Tr. 261). Because of Claimant's permanent urinary retention, Dr. Slobodov ordered intermittent catheters for catheterization four times daily or 120 per month. (Tr. 267).

On June 15, 2010, Dr. Chacko completed a physical RFC questionnaire on Claimant. He diagnosed Claimant with cauda equina syndrome evidenced

11

by urinary problems.  He estimated that her condition would last at least twelve months.  (Tr. 270).  Dr. Chacko also diagnosed Claimant with depression.  He found Claimant's condition would frequently interfere with her attention and concentration needed to perform even simple work tasks.  (Tr. 271).  He also found Claimant could never look down, turn her head right and left, look up, hold head in a static position, twist, stoop, crouch/squat, climb ladders, or climb stairs.  (Tr. 272).  Although it is not entirely clear from the marking of the form, it appears Dr. Chacko found Claimant could not sit for any period of time.  Curiously, he found Claimant must walk every minute and must walk one minute each time.  He did not find Claimant had to shift positions at will for a job, did not require that her legs be elevated, and did not need to use an assistive device to walk.  Dr. Chacko found Claimant could lift and carry any weight in a competitive work situation.  (Tr. 273).

In notes dated June 15, 2010 and September 7, 2010, Dr. Chacko again assessed Claimant with cauda equina syndrome.  (Tr. 311-12).  No clinical findings are made in these brief notes to support the assessment.

In July of 2010, Claimant was evaluated at the Urology Clinic.  It is noted that Claimant had "no bladder symptoms."  (Tr. 444).  She was, however, again assessed with a neurogenic bladder.  (Tr. 445).

In July of 2011, Dr. Chacko continued to asses Claimant with cauda

equina syndrome but noted it was "stable." He also set out that he advised Claimant "to go to mayo." (Tr. 453).

In a records review by Dr. John E. Cattaneo in May of 2011, he noted the findings of cauda equina syndrome. He concluded, however, that "[b]ased upon the evidence . . . I don't see any evidence to support a diagnosis of cauda equina syndrome." (Tr. 462).

After Claimant filed for benefits in October of 2009, the first unfavorable decision was entered by the ALJ on March 3, 2011. The ALJ determined Claimant's severe impairments included neurogenic bladder. (Tr. 22). He focused largely upon the severity of Claimant's back condition and her unremarkable urological testing. (Tr. 28). This decision was reversed by this Court based upon the fact that the ALJ provided insufficient explanation as to why the severe impairments at step two became insignificant at step four. (Tr. 553-54).

In notes from July, August, October, December of 2011 as well as January, February, March of 2012, Dr. Chacko continued to assess Claimant with cauda equina syndrome. He also noted no "urinary frequency" on several occasions. (Tr. 644-50).

In notes from April, July, and December of 2012 as well as February of 2013, Dr. Chacko noted Claimant was "[d]oing relatively well" on at least one occasion and that Claimant "denies change in bowel habits, no bleeding in stool, no urinary frequency . . . ." (Tr. 639-43).

In March of 2012, Dr. Jeremiah Jansen noted from CT scan results

that Claimant had "[n]o ureteral stones or obstructive uropathy." (Tr. 655).

In August of 2013, Dr. Misty Branam assessed Claimant with cauda equina syndrome with neurogenic bladder, but noted the condition was "stable." (Tr. 676).

In September of 2013, Dr. Scott E. Litwiller of Urologic Specialists of Oklahoma evaluated Claimant. Claimant reported voiding dysfunction with urination every three hours in the daytime and nocturia three to four times per night. She had mild urinary urgency. Claimant denied daytime urinary leakage or with mild or strenuous activity. She had urinary hesitancy and always strained to urinate. She reported poor urinary flow and intermittency. She often had a feeling of incomplete bladder emptying and an inability to empty her bladder. She experienced pain with bladder filling but does not have dysuria. (Tr. 668).

Dr. Litwiller noted Claimant was "with neurogenic bladder from cauda equina syndrome after MVA, dependent on intermittent catheterizations, currently at 6-8 daily. She will require catheterizations indefinitely . . . ." (Tr. 671).

On remand, a second unfavorable decision was reached on January 14, 2014. Neurogenic bladder was again identified as a severe impairment at step two, along with several other conditions. (Tr. 468). The ALJ largely concentrated upon Claimant's back condition and the lack of limitation that it imposed upon her ability to work. (Tr. 478-83). He

14

did note that Claimant had to self-catheterize.  (Tr. 480).

On September 14, 2015, this Court again reversed the ALJ's decision and remanded for further consideration.  The basis of the reversal was the ALJ's failure to include any restriction imposed by the requirement for self-catheterization six to eight times per day.  The ALJ was also directed to include such a restriction in the hypothetical questioning of the vocational expert.  (Tr. 747-48).

On September 1, 2016, a third unfavorable decision was entered against Claimant's claims for benefits.   The ALJ again determined Claimant's neurogenic bladder to be a severe impairment at step two. (Tr. 698).  After discussing the medical records concerning Claimant's bladder condition, including acknowledgement that Claimant was advised to self-catheterize six times per day, the ALJ concluded Claimant could perform light work.  (Tr. 702).  He found

> [i]n considering the claimant's neurogenic bladder, the undersigned does not find the claimant requires special accommodation. For example, she does not have leakage with strenuous activity and she denied reported (sic) only mild urgency when taking her medication . . . . Further, the claimant had not reported any difficulty with her catheter.

(Tr. 703-04).

On March 21, 2018, this Court reversed and remanded the decision essentially based upon every other reversal which preceded it.  The ALJ failed to include the restrictions imposed by self-catheterization six to eight times per day, taking 10-20 minutes each time she catheterized.

(Tr. 1487). This Court also noted that when unscheduled breaks for self-catheterization was included in the hypothetical questioning of the vocational expert together with her other limitations, no employment was available to Claimant. (Tr. 1489). This Court also determined that the catheterizations were not on a set schedule which could be accommodated with morning, lunch, and afternoon breaks. (Tr. 1490).

Claimant was attended by Dr. Nelson Onaro from May of 2015 through January of 2019 as evidenced by the medical record. Dr. Onaro acted as Claimant's primary care physician treating a variety of conditions including urinary incontinence on several occasions. (Tr. 1933, 1957, 1959-72). Although it was not noted in every record Dr. Onaro produced during his lengthy treatment relationship with Claimant, depending upon the condition for which she was seeing him on a particular visit, Dr. Onaro also noted Claimant's neurogenic bladder condition on several occasions. (Tr. 1276, 1280-82, 1300, 1313, 1329, 1974, 1977).

Additionally, the ALJ references in the latest decision that Claimant failed to include catheters in her medication listing, ostensibly questioning whether the procedure was even necessary. (Tr. 1374). While it is true that the catheters were not on every list, the requirement for catheters did appear on some lists. (Tr. 1070, 1093, 1102).

At an administrative hearing on January 3, 2019, Claimant provided further testimony before the latest ALJ decision. She testified that

had to use a catheter six to seven times per day because she is on a water pill. She testified that generally she used a catheter four or five times a day. (Tr. 1417). Claimant testified that she takes up to ten minutes per time to use the catheter. (Tr. 1419). The amount of time that the procedure takes depends upon whether Claimant gets it in the right place or not. She does not catheterize at the same exact time every day. She also catheterizes at night twice before bed and a couple of times during the night. (Tr. 1434).

In the latest decision, the ALJ discussed Claimant's bladder condition extensively. (Tr. 1371-74). He noted the various references to cauda equina syndrome in the record arising from a motor vehicle accident involving Claimant when she was 12 years old which broke her neck. The ALJ concluded that there was insufficient evidence to establish the condition as a medically determinable impairment. (Tr. 1371). Indeed, the diagnostic evidence for cauda equina syndrome is indistinct and varied such that this Court agrees with the ALJ's assessment that this condition is not sufficiently established in the medical record. The repeated references to the condition, however, does not discount the references and diagnoses of neurogenic bladder, which is also recurring in the medical file and well-established.

Historically, Claimant has been diagnosed with neurogenic bladder. Dr. Onaro's records do not consistently contain references to the condition or treatment for it. While references are made to "urinary

17

incontinence", the requirement for catheterizations or neurogenic bladder completely disappears. (Tr. 1933-40, 1957-72). This omission is curious considering Dr. Onaro was Claimant's primary physician during this period. Emergency room records from the McAlester Regional Health Center from December of 2017 also show "no symptoms reported" under the genitourinary portion of the report. (Tr. 1943). Moreover, Dr. Onaro completed an RFC assessment on Claimant in January of 2019. Neither Claimant's neurogenic bladder nor her requirement for catheterization are referenced in the report while other conditions and the limitations that they impose upon Claimant's ability to function are set out in detail. (Tr. 1947-55).

Additionally, Claimant's testimony concerning the frequency and duration of the self-catheterization procedure has changed considerably from hearing to hearing. The frequency has ranged from a high of six to eight times per day to her latest testimony that she would "generally" need to self-catheterize four to five times per day. The duration has ranged from up to 30 minutes to the current estimation in her testimony of 10 minutes.

Where an ALJ finds at least one "severe" impairment, a failure to designate another impairment as "severe" at step two does not constitute reversible error because, under the regulations, the agency at later steps considers the combined effect of all of the

claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. Brescia v. Astrue, 287 F. App'x 626, 628-629 (10th Cir. 2008). The failure to find that additional impairments are also severe is not cause for reversal so long as the ALJ, in determining Claimant's RFC, considers the effects "of all of the claimant's medically determinable impairments, both those he deems 'severe' and those 'not severe.'" Id. quoting Hill v. Astrue, 289 F. App'x. 289, 291-292, (10th Cir. 2008).

Moreover, the burden of showing a severe impairment is "de minimis," yet "the mere presence of a condition is not sufficient to make a step-two [severity] showing." Flaherty v. Astrue, 515 F.3d 1067, 1070-71 (10th Cir. 2007) quoting Williamson v. Barnhart, 350 F.3d 1097, 1100 (10th Cir. 2003); Soc. Sec. R. 85-28. At step two, Claimant bears the burden of showing the existence of an impairment or combination of impairments which "significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). An impairment which warrants disability benefits is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory

diagnostic techniques." 42 U.S.C. § 1382c(a)(1)(D). The severity determination for an alleged impairment is based on medical evidence alone and "does not include consideration of such factors as age, education, and work experience." <u>Williams v. Bowen</u>, 844 F.2d 748, 750 (10th Cir. 1988).

The ALJ completed a detailed review of the medical record concerning Claimant's neurogenic bladder. He concluded that after Dr. Litwiller's appointment with Claimant in September of 2013, little mention is made of Claimant's self-catheterization other than as a matter of reported history. Indeed, the latest medical records completely omits any reference to the condition. Moreover, the diminished time and frequency for self-catheterization in Claimant's testimony and the limitations it imposes supports the ALJ's finding of non-severity at step two. The ALJ's alternative finding that the condition would require no additional work breaks is now supported by Claimant's testimony. Claimant has not sustained her burden of demonstrating significant limitation caused by this condition upon her ability to engage in basic work activity.

### Consideration of Opinion Testimony

Claimant asserts the ALJ improperly discounted the opinions of two of her treating physicians – Drs. Onaro and Chacko. As previously indicated, Dr. Onaro estimated in a series of functional reports that

20

Claimant would be absent from work three or more days per month due to COPD exacerbations and severe back, neck, and knee pain. (Tr. 1947). He found Claimant would not respond appropriately to work situations; not deal with changes in routine work settings; could not maintain concentration and attention for extended periods in a routine work setting; could not handle normal work stress in a routine work setting; and could not be expected to attend any employment on a sustained basis. (Tr. 1949). Dr. Onaro attributed these limitations to chronic musculoskeletal pains – back, neck and bilateral knee pain and fibromyalgia. He also noted sleep deprivation from obstructive sleep apnea and depression. Id. Dr. Onaro noted several limitations which precluded even sedentary work. (Tr. 1950). He rated Claimant's pain at 8-9 out of 1-10. He noted decreased range of motion and painful response to palpation of the affected areas. (Tr. 1951). Dr. Onaro found that Claimant's conditions would frequently interfere with her attention and concentration and that she would only be capable of performing low stress jobs. He estimated that Claimant could walk two city block without rest or severe pain, could sit for one hour at a time and stand for 30 minutes at a time. (Tr. 1952). Dr. Onaro wrote that Claimant could stand/walk for about two hours in a workday and sit for about four hours in a workday. He stated Claimant must walk about every 30-45 minutes for 15 minutes. She needed to shift positions at will and would take unscheduled breaks. He estimated Claimant could lift about

21

ten pounds, occasionally. (Tr. 1953). Claimant could look up and down occasionally, twist, stoop, and crouch/squat occasionally, and never climb ladders. She had not manipulative limitations. Claimant's impairments were likely to cause "good days" and "bad days." (Tr. 1954). This Court has previously set out Dr. Chacko's RFC findings of limitation. (Tr. 270-73).

The ALJ set out in detail these physicians' opinions. (Tr. 1387-88). He determined on both opinions that they were not entitled to controlling weight because they were not well-supported by medically accepted clinical and diagnostic techniques and lacked consistency with other substantial evidence, including their own treatment notes. Id.

In deciding how much weight to give the opinion of a treating physician, an ALJ must first determine whether the opinion is entitled to "controlling weight." Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003). An ALJ is required to give the opinion of a treating physician controlling weight if it is both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) "consistent with other substantial evidence in the record." Id. (quotation omitted). "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

Even if a treating physician's opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors

provided in 20 C.F.R. § 404.1527." Id. (quotation omitted). The
factors reference in that section are: (1) the length of the treatment
relationship and the frequency of examination; (2) the nature and extent
of the treatment relationship, including the treatment provided and the
kind of examination or testing performed; (3) the degree to which the
physician's opinion is supported by relevant evidence; (4) consistency
between the opinion and the record as a whole; (5) whether or not the
physician is a specialist in the area upon which an opinion is rendered;
and (6) other factors brought to the ALJ's attention which tend to
support or contradict the opinion. Id. at 1300-01 (quotation omitted).
After considering these factors, the ALJ must "give good reasons" for
the weight he ultimately assigns the opinion. 20 C.F.R. §
404.1527(d)(2); Robinson v. Barnhart, 366 F.3d 1078, 1082 (10th Cir.
2004)(citations omitted). Any such findings must be "sufficiently
specific to make clear to any subsequent reviewers the weight the
adjudicator gave to the treating source's medical opinions and the reason
for that weight." Id. "Finally, if the ALJ rejects the opinion
completely, he must then give specific, legitimate reasons for doing
so." Watkins, 350 F.3d at 1301 (quotations omitted).

The ALJ explained his rejection of these opinions in considerable
detail. Dr. Chacko's functional limitations are particularly
unreasonably restrictive considering his clinical findings. Dr. Onaro's
findings are not reflected in his treatment records, including the

reduction in range of motion or response to palpation.  In short, the ALJ's attribution of less than controlling weight to these opinions is supported by the record.

### Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  Therefore, the Magistrate Judge recommends for the above and foregoing reasons, the ruling of the Commissioner of Social Security Administration should be **AFFIRMED**.  The parties are herewith given fourteen (14) days from the date of the service of these Report and Recommendation to file with the Clerk of the court any objections, with supporting brief.  Failure to object to the Report and Recommendation within fourteen (14) days will preclude appellate review of this decision by the District Court based on such findings.

DATED this 15th day of March, 2021.

_____
KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE